SILVER KING COALITION MINES CO. et al.
v. INDUSTRIAL COMMISSION et al.

No. 7172.   Decided April 7, 1949.   (204 P. 2d 811.)

See 71 C. J., Workmen's Compensation Acts, sec. 815; 58 Am. Jur. 869. Findings of fact to support administrative determinations relating to workmen's compensation, note, 146 A. L. R. 123.

See also, 115 Utah 350, 204 P. 2d 817.

*Shirley P. Jones,* of Salt Lake City, for plaintiffs.

*Grover A. Giles,* Atty. Gen., *C. N. Ottosen,* Asst. Atty. Gen. and *Clarence M. Beck,* of Salt Lake City, for defendants.

LATIMER, Justice.

Certiorari to the Industrial Commission for the purpose of reviewing an award of compensation to Dora R. Draper, widow of Jesse R. Draper, deceased on account of death allegedly caused by silicosis and superimposed tuberculosis.

Two important questions are raised by this review. First, is the applicant, Dora R. Draper, prevented from pursuing her claim because the commission refused to permit an autopsy? Second, is there substantial competent evidence to support the findings of the commission that the employee died as a result of an occupational disease? Our holding

on the first question requires that the award be set aside and the matter referred back to the commission for such further action as may by it be considered appropriate. Accordingly, we express no opinion on the second question.

Jesse R. Draper, deceased, was an employee of the Silver King Coalition Mines Company, in its mine at Park City, Utah. Mr. Draper discontinued his work with the mine company on March 31, 1947, and he died April 8th of the same year. He had been sick for a considerable period of time prior to his death, but a report had not been furnished to the employer. Neither the mining company nor its insurance carrier was furnished with information concerning his death until after his burial. On May 16, 1947, the Industrial Commission notified the insurance carrier that a claim for compensation had been filed. In the claim it was alleged that deceased's death was caused by an occupational disease, namely silicosis. Upon being informed of the claim, the insurance carrier made a rather extensive investigation as to the cause of his death. On May 27, 1947, applicant was contacted and informed that the insurance carrier had interviewed the doctors who might have knowledge of decedent's condition but from the information available, it was impossible to determine the cause of the employee's death; that the only way it could be definitely established was by means of an autopsy, and a request was made that this be permitted. The applicant refused to consent to have the body disinterred. Further investigation was made by the insurance carrier and a written demand was made upon the applicant for her consent. Not receiving a reply to this last demand, the insurance carrier, on June 3, 1947, made a written request to the Industrial Commission for an order requiring an autopsy. The applicant was then contacted by the Industrial Commission and advised as to the demand, but apparently she remained adamant in her refusal to permit an examination. The Commission, at that time, refused to order an autopsy out of deference to applicant's wishes. During

an informal hearing on the matter, the Commissioner made the following statement to the applicant and the agent for the insurance carrier:

"As it stands, I will not order an autopsy. I request that both of you go in quest of more information on which the case may be decided."

Some further efforts to determine the cause of death were made and after having used reasonable efforts to secure additional accurate information, the carrier informed the commission that evidence with respect to the cause of death was still uncertain and unsatisfactory and that accurate information could be obtained only by a post mortem examination. Subsequent to this, the commission, by letter dated June 24, 1947, notified the insurance carrier that out of deference to the wishes of applicant and in view of information which seemed to be available in connection with the death of Mr. Draper, the request for an autopsy was denied. Both the Commission and applicant were advised prior to denial of the order that in the opinion of competent pathologists, a successful autopsy could be performed as late as six to eight months after death and any uncertainties as to the presence of a silicotic condition in the lungs could be removed. Prior to taking of evidence before the Commission, the insurance carrier objected to proceeding until such time as an autopsy was permitted.

It is regretted that the commission in this case refused to order an autopsy. The statute defining silicosis is narrow and restrictive and the evidence, which will be hereinafter detailed, dealing with the cause of death is doubtful and uncertain. The Commission was advised, in ample time to permit an autopsy, that the medical experts were in disagreement as to the cause of death; and, that a post mortem examination was the only reliable means by which it could be determined whether or not silicosis superimposed by tuberculosis was a factor in causing the death of the deceased. The Legislature by enacting Section 42-1a-29, U.

C. A. 1943, provided the commission with a method of obtaining accurate evidence by scientific means and to close the door on this kind of evidence is to shut out a strong probability of obtaining the true cause of death. Even though an applicant may have some understandable and sentimental reasons against permitting an autopsy, the commission should strive to obtain the most reliable information and personal desires should be required to yield to scientific methods of establishing facts.

Historically, exhumation of bodies was considered in all respects as "body stealing" and was looked on as a violation of a sacred right. 15 Am. Jur., para. 40, Dead Bodies, contains the following statement portraying the public attitude toward disinterring human bodies:

"Civilized countries have always recognized and protected as sacred the right to Christian burial and to an undisturbed repose of the human body when buried. The desecration of burial grounds is an offense both under the common law and modern statutes. The unauthorized disinterring of the body of a deceased human being is an indictable offense both at common law and by statute, regardless of the motive or purpose for which the act is done. * * *"

In the case of *Thompson* v. *Deeds*, 93 Iowa 228, 61 N. W. 842, 35 L. R. A. 56, the Iowa Supreme Court announces a somewhat similar principle. In that case it is said:

"* * * A proper appreciation of the duty we owe to the dead, and a due regard for the feelings of their friends who survive, and the promotion of the public health and welfare, all require that the bodies of the dead should not be exhumed, except under circumstances of extreme exigency. * * *"

While as indicated in the two previous quotations the general policy of the law has been against the exhumation of bodies, it was early realized that for certain evidentiary purposes, such a right must be recognized. In an effort to permit parties to produce scientific or essential evidence, many jurisdictions enacted legislation permitting the disinterring of bodies for certain limited purposes, particularly when an autopsy would settle questions involving the pro-

tection of health, discovery of crimes, or the cause of death or would furnish vital information not otherwise obtainable.

The early hostility towards exhuming bodies was lessened and the right to perform an autopsy was first granted to the state. 15 Am. Jur. Dead Bodies, para. 28, states the rule to be:

"Autopsies are sometimes essential to the protection of health and the discovery of crime. In such a case, the welfare of society demands that the state or its authorized representative be permitted to conduct an examination by dissection if necessary without reference to the wishes of the relatives of the dead. Hence, a coroner has the right to perform an autopsy or have one performed where reason therefor exists, and there is no liability on his part if the autopsy is performed in an ordinarily careful manner, notwithstanding the absence of consent by the members of deceased's family. * * *"

That the rule was further relaxed so that litigants, other than the state might resort to the courts for permission to exhume a body is suggested by the following statement taken from 25 C. J. S., Dead Bodies, § 4, page 1019:

"There is a distinction between the rights existing prior to burial and those after burial, because after its interment the body is in the custody of the law and a disturbance of its resting place and its removal is subject to the control and direction of a court of equity in any case properly before it. It is the policy of the law, except in cases of necessity or for laudable purposes, that the sanctity of the grave should be maintained, and that a body once suitably buried should remain undisturbed; and a court will not ordinarily order or permit a body to be disinterred unless there is a strong showing that it is necessary and that the interests of justice require it. However, there is no universal rule applicable, each case depending on its own facts and circumstances; and for a valid reason, upon application by a proper person, the removal of a body will be permitted."

With opposition to disinterment being gradually overcome, the right of private litigants to an autopsy could be acquired by contract or by authority of the state. This state has authorized post mortem examinations in criminal proceedings, see Chap. 27, Laws of Utah

1945, and in litigation dealing with occupational disease. The law with which we are presently concerned is Section 42-1a-47, U. C. A. 1943. It reads as follows:

"On the filing of a claim for compensation for death from an occupational disease where in the opinion of the commission it is necessary to accurately and scientifically ascertain the cause of death, an autopsy may be ordered by any member of the commission and shall be made by a person designated by such member of the commission. The person requesting any such autopsy shall pay the charge of the physician making the same. Any person interested may designate a duly licensed physician to attend such autopsy, and the findings of the physician performing the autopsy shall be filed with the commission and shall be a public record. All proceedings for compensation shall be suspended upon refusal of a claimant or claimants to permit such autopsy when so ordered. Where an autopsy has been performed pursuant to an order of any member of the commission no cause of action shall lie against any person, firm or corporation for participating in or requesting such autopsy."

We find nothing in this section which gives any litigant an absolute right to have an autopsy performed. At the most, it liberalized the common law rule and permits an autopsy to be performed when, in the opinion of the commission, it is necessary to accurately and scientifically ascertain the cause of death. Its purpose is to give litigants an opportunity to obtain and present to the commission scientific and reliable evidence on the causes of death. To allow sentimental reasons to be used as an excuse to prevent the examination not only defeats the purpose of the act but prevents the commission from obtaining what might be the true facts. We cannot, of course, extend this statute beyond the meaning of the terms employed but we can determine the legislative intent within the phraseology of the section, keeping in mind the purpose motivating the enactment.

Approaching the problem from a legislative aspect, we conclude that the legislature intended to make the decision ordering an autopsy discretionary with the commission. That the legislature further intended that in exercising its discretion the commission would not act

in an arbitrary and capricious manner, but would exercise its discretion rationally and reasonably. It would appear to be unrealistic for us to conclude the legislature intended that the commission had the power to arbitrarily deny the request and that such action was not subject to review by this court. Such an interpretation would clothe the commission with, untouchable powers and extend to it authority not possessed by any other quasi-judicial agency.

Section 42-1a-47, U. C. A. 1943, prohibits the Commission from proceeding with a hearing if the applicant refuses to permit an autopsy when ordered by the Commission. However, there is no provision as to what shall be done if the Commission arbitrarily fails to so order—apparently for the reason that the legislature assumed that permission would be granted by the Commission when reasonably necessary for the purposes of determining the cause of death. In view of the fact that the Commission proceeded with the hearing without an autopsy, we must determine whether or not its denial of the request for the autopsy was arbitrary and capricious. If so, then the employer should be entitled to the same right as is granted by the statute against a non-complying applicant. We turn to the evidence to determine this question.

Dr. H. I. Goodwin testified substantially as follows: That he was a physician-surgeon who had practiced in the State of Utah for approximately twenty-years; that he was practicing his profession in Park City, Utah, in the month of November, 1940; that while practicing in that city he had an occasion to examine the deceased; that from his examination he concluded deceased was suffering from spontaneous pneumothorax; that deceased was hospitalized for a couple of days and then was sent down to Dr. Kerby for an X-ray checkup; that X-rays were taken by Dr. Kerby and according to his (Dr. Kerby's report) the X-rays disclosed pneumothorax and nodulation, silicosis and tuberculosis—pneumoconisosis or tuberculosis; that he had never examined the X-ray pictures and his testimony was based on Dr.

Kerby's report; that from his own knowledge he did not know whether deceased was suffering from silicosis or tuberculosis; that the symptoms he observed in the deceased were compatible with the diagnosis given by Dr. Kerby, but to say his physical condition was due to tuberculosis or silicosis would just be guesswork; that Dr. Kerby's report, the man's history and his appearance influenced the doctor and gave him the impression that the deceased was suffering from tuberculosis and silicosis.

Dr. Kerby, an X-ray specialist, testified as follows: That he examined X-ray films made of the chest .of one Jesse R. Draper; that he did not recall ever having seen the man personally but the pictures were taken in his office on or about December 20, 1940; that he examined the pictures and his office record indicated a finding that in 1940 the patient was suffering from silicosis and tuberculosis of the lungs; that he reported his findings to Dr. Goodwin at that time; that the X-ray pictures had been lost in a shuffle; that he had no independent recollection of reading the films and that the only way he could refresh his memory and determine his conclusions as of 1940 was by reference to his report; that he could not say the patient had active pulmonary tuberculosis and the only way this could be determined would be by an examination; that he could not remember the degree of silicosis and that he could not state that the condition he observed in the 1940 films was disabling.

At a rehearing, Dr. Kerby was shown films taken of the deceased on April 7, 1947, and based on these he testified that they indicated tuberculosis in the upper middle lobe of the right lung with some inflammation of the left lung; that he could see marks which he thought were compatible with things incident to some type of dust inhalations; that considering his report of 1940 together with the 1947 X-rays, he was still of the opinion that the change in the man's condition was brought about by tuberculosis and silicosis; that he could not tell whether the tuberculosis

was active and that he could not tell whether tuberculosis or silicosis might have caused his death; that he believes silicosis can and does cause heart failure, but there was no evidence on the films that either silicosis or tuberculosis were important in producing the acute myocarditis; that he was unable to ascertain the degree of silicosis and that he could not state that the condition indicated by the X-rays would be disabling or cause death; that a post mortem examination was the only certain way to determine the presence or absence of silicosis; that based on his examination of films in 1940 and his examination of the films in 1947, he believed the deceased had tuberculosis and silicosis; but that from an examination of the 1947 films alone, he would not state deceased had silicosis but only that there were indications compatible with this disease.

Dr. Karl O. Nielsen testified that he is a physician and surgeon practicing in Heber, Utah; that he treated deceased for a period of eight or nine years; that deceased suffered from dyspnea which increased very rapidly during the last two years; that he formed an opinion that deceased had tuberculosis superimposed on silicosis; that he prepared and filed the death certificate and his diagnosis was that deceased died from acute myocarditis due to pulmonary silicosis and questionable tuberculosis; that his office was not equipped to do sputum examinations and his opinion on questionable tuberculosis was based on his clinical determination; and that he was not an expert in reading X-rays but had taken some pictures in the hospital. At the first hearing he examined the 1947 X-rays taken at the sanitarium and pointed out what he believed to be silicotic nodules in both lungs. He was able to identify approximately half a dozen markings on the films which he determined were silicotic nodules but was unable to determine what degree or stage of silicosis was shown by the films.

Dr. Paul S. Richards testified that over a twenty-five year period, he had made a particular study of silicosis; that in speaking of silicosis per se, it is divided into three

stages—first, second and third stage; that the third stage is the disabling stage; that he had examined the films taken at the Utah State Tuberculosis Sanitorium (the 1947 films) and was unable to find any silicotic condition; that the pictures did not disclose a silicotic condition, either secondary or primary, which would cause death; that the pictures indicated a case of fibroid tuberculosis; that in order to make a diagnosis of silicosis there must be a characteristic X-ray pattern; that the pictures did not disclose even nodulation and uniform dissemination that must appear before a definite diagnosis of silicosis can be made; that a silicotic pattern is uniform in all patients; that an autopsy should be performed to positively diagnose the absence or presence of disabling silicosis; that from the films he could not determine the presence of silicosis or any of its effects that would be a contributing factor to the man's death; that in order to diagnose silicosis from X-ray films the pictures must show small nodules of fibroid tissues similarly disseminated throughout both lungs; that the characteristic pattern of silicosis is entirely missing in the pictures taken of deceased's lungs; and that heart disease as the resultant factor of silicosis only occurs in extremely advanced cases of silicosis.

The medical evidence is summarized briefly by us merely for the purpose of showing that the cause of death was doubtful and the error of the Commission in denying the autopsy was prejudicial to the substantial rights of the employer; prejudicial for the reasons that the employer was prevented from obtaining what might have been the true reason for·the death of the deceased and it was denied the right to produce evidence which the statute contemplated would be made available by the Commission.

The attending physician at the time of death concluded that the deceased died from acute myocarditis due to pulmonary silicosis and questionable tuberculosis. This opinion was based on clinical determination and was arrived at without the aid of pictures or from an examination. A

later examination of X-ray films did not alter this opinion as he concluded the films indicated the presence of silicosis.

Dr. H. I. Goodwin, who treated the deceased some seven years before his death, was not prepared to testify as to the cause of death or the presence of silicosis or tuberculosis. His examination established that deceased was suffering from pneumothorax and any opinion he had concerning silicosis or tuberculosis was based entirely on Dr. Kerby's report of 1940.

Dr. Kerby was of the opinion that deceased had silicosis in 1940 and basing his judgment on his report of 1940, he believed that deceased still had silicosis in 1947. He could not conclude from the 1947 pictures that the deceased was suffering from silicosis, but he could see some indications compatible with the disease. He believed that silicosis could cause heart disease. However, the films did not indicate that either silicosis or tuberculosis had progressed to the stage where it would contribute to the heart condition. He was not questioned concerning the disabling or death producing stage and was unable from either his 1940 report or in his examination of the pictures to determine what stage had been reached in 1947.

Dr. Richards testified that only the third or extremely advanced stage of silicosis would be a factor in heart disease, and there was a total absence of any lung pattern which might indicate the presence of silicosis in any of its stages. His research work with silicosis, his experience with and treatment of silicotic patients lead him to believe that silicotic patterns were uniform in all persons and the characteristics of nodulation and uniform dissemination were always present in advanced silicosis.

We, of course, do not weigh the conflicting medical opinions or decide whether there is any evidence to sustain the findings of the Commission on the cause of death. All we decide is that all doctors who in any way participated in treating the deceased or who testified as witnesses at the

hearing were uncertain as to the factors causing the acute myocarditis. There is no denial of Dr. Richards' testimony that silicosis must reach the advanced stage before it becomes a factor in heart diseases and there is no testimony in the record to the effect that the 1947 films show this advanced stage. There is disagreement as to whether or not silicosis might ever become a producing cause of heart disease; but those doctors who testified that in their opinion silicosis could be a contributing factor did not dispute the statement that only the advanced stage would bring about this result. Moreover, the only evidence in the record that silicosis or tuberculosis were contributing factors to the death is the death certificate executed by Dr. Nielsen and in his testimony on the witness stand. Both the certificate and his testimony is uncertain in connection with the diagnosis of silicosis and superimposed tuberculosis as being a contributing factor to decedent's death.

Section 42-1a-29, U. C. A. 1943 defines silicosis as follows:

"For the purpose of this act 'silicosis' is defined as a chronic disease of the lungs caused by the prolonged inhalation of silicon dioxide dust ($SiO2$) characterized by small discrete nodules of fibrous tissue similarly disseminated throughout both lungs, causing a characteristic X-ray pattern, and by variable clinical manifestations."

While we need not determine the necessity of establishing every element included in our statutory definition, the testimony of Dr. Nielsen is far from establishing the major elements required by our enactment.

All of the doctors had been interviewed by the insurance carrier before the commission denied the request for the autopsy. The evidence given the adjustor for the insurance carrier was in substance the same as detailed here and both the applicant and the Commission were informed of its substance and were informed that each doctor had expressed uncertainty about the cause of death. With this knowledge before the Commission, and with the further knowledge that a post mortem examina-

tion was the only means by which a true cause of death could be established, we are unable to conclude why any reasonable person or any reasonable commission would deny an autopsy. Conceding the legislature intended to vest the commission with discretionary powers, the discretion we envisage the legislature had in mind, is not the indulgence of a whim, but is the exercise of sound judgment based on facts and guided by law. Undoubtedly, the commission was actuated solely by the personal preference of the applicant and as between the two litigants the error was committed at the solicitation of the applicant and the effect of the error must be accepted by her.

The award is annulled and the matter remanded to the Commission for further proceedings not inconsistent with this opinion.

PRATT, C. J., and WOLFE, WADE, and McDONOUGH, JJ., concur.